**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Wegbreit Group LLC, | No. CV-19-01192-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Rite-Kem Incorporated, et al., | |
| Defendants. | |

## INTRODUCTION

Pending before the Court are motions to dismiss, or, in the alternative, transfer venue filed by Defendants Rite-Kem Incorporated ("Rite-Kem") and Mark C. Lovil ("Lovil") (together, "Defendants"). (Docs. 12, 14.) Both Defendants contend the Court lacks personal jurisdiction over them. For the following reasons, the Court agrees and grants both motions to dismiss.

## BACKGROUND

Plaintiff Wegbreit Group LLC ("Wegbreit") is a distributor of "personal amenity items packaged in small sized containers (i.e. mouthwash, toothpaste, shampoo, antibacterial wipes, etc.) generally designed to meet the needs of anyone who is away from home such as guests in the hospitality industry, patients in the health care industry and disaster victims." (Doc. 1 ¶ 21.) Rite-Kem is "a vendor of emergency supply kits to the General Services Administration . . . which kits were to be provided to the Federal Emergency Management Agency . . . ." (*Id.* ¶ 22.)

The complaint alleges that Rite-Kem failed to pay for certain goods it received after submitting purchase orders to Wegbreit. (*Id.* ¶¶ 28-31, 33.) The complaint further alleges that, although Lovil, Rite-Kem's president, agreed to be personally liable for Rite-Kem's debts, he also has not paid for the goods. (*Id.* ¶¶ 23-26, 32)

Wegbreit and Defendants have submitted declarations/affidavits in support of their personal jurisdiction arguments. Wegbreit attached a declaration from Susan Wegbreit ("Susan"), its vice president of sales, to its response to Rite-Kem's motion (Doc. 17-1) and its response to Lovil's motion (Doc. 20-1). Lovil filed an affidavit in support of Rite-Kem's motion (Doc. 12-1) and another in support of his own motion (Doc. 14-1). The relevant facts from those declarations/affidavits are as follows:

Rite-Kem is a Mississippi corporation with its principal place of business in Mississippi. (Doc. 12-1 ¶ 2; Doc. 14-1 ¶ 3.) Lovil is also a Mississippi "resident citizen." (Doc. 14-1 ¶ 2.)

Wegbreit is an Arizona LLC with its principal place of business and headquarters in Arizona. (Doc. 17-1 ¶¶ 3-4.)[1] Wegbreit's two employees both reside in Arizona. (*Id.* ¶¶ 5, 27.)

Rite-Kem is not licensed to do business in Arizona, does not maintain an office in Arizona, and does not own any real estate in Arizona. (Doc. 12-1 ¶¶ 4-6.) Furthermore, Rite-Kem does not have an Arizona telephone number or statutory agent and does not advertise or otherwise solicit business in Arizona. (*Id.* ¶¶ 6-8.) Similarly, Lovil also does not own any property in Arizona or have an Arizona number. (Doc. 14-1 ¶¶ 6-7.)

---

[1] The Court notes that, although the complaint alleges that Wegbreit is "a citizen of Arizona" because it is "an Arizona limited liability company having its principal place of business in Phoenix, Arizona" (Doc. 1 ¶¶ 1, 6), neither the complaint nor the affidavits from Susan identify the *members* of the LLC or allege the citizenship of those members. Because "an LLC is a citizen of every state of which its owners/members are citizens," *Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006), the Ninth Circuit has held that "to properly plead diversity jurisdiction . . . with respect to a limited liability company, the citizenship of all of the members must be pled." *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 611 (9th Cir. 2016). Thus, Wegbreit has not met its burden of establishing the Court has subject matter jurisdiction over this action. Although this deficiency would presumably be easy to cure, the Court will not require Wegbreit to amend its complaint because, as discussed *infra*, dismissal is required due to a lack of personal jurisdiction.

On May 14, 2018, Lovil, on behalf of Rite-Kem, sent an email to Susan stating that he "was given [her] contact information as a possible source for various personal care (hygiene) items." (Doc. 17-1 at 3 ¶ 11, 8.)

The next day, Lovil and Susan spoke by phone. (*Id.* at 3 ¶ 13.) They also exchanged emails in which Susan indicated Wegbreit's address was in Arizona and Lovil requested pricing for certain products. (*Id.* at 3 ¶ 13, 10-11.)

After May 15, 2018, Rite-Kem and Wegbreit began exchanging "serial and ongoing" emails and telephone calls. (*Id.* ¶ 14.) Rite-Kem's calls and emails were "directed from Mississippi to [Wegbreit] in Arizona." (*Id.*)

"As a result of" these emails and calls, Rite-Kem and Wegbreit entered into a Credit Application on or about July 2, 2018, which was "entered into and delivered . . . to [Wegbreit] in Arizona." (*Id.* ¶ 15.) This Credit Application lists an Arizona address for Wegbreit. (Doc. 1-2 at 2-3.) Lovil "electronically signed" that form, as well as another form allowing Wegbreit to obtain credit information about Rite-Kem from a bank in Mississippi. (Doc. 12-1 ¶ 16.)

Susan states in her declaration that Rite-Kem and Lovil "jointly entered into" the Credit Application. (Doc. 17-1 ¶ 15.) She further states that "Lovil was 'unconditionally' obligated to pay" Rite-Kem's debts to Wegbreit. (Doc. 20-1 ¶ 18.) In contrast, Lovil states that he executed the Credit Application in his capacity as president of Rite-Kem, "did not sign the Credit Application in [his] individual capacity," and "did not personally guarantee Rite-Kem's payment obligations to Wegbreit." (Doc. 14-1 ¶¶ 3-5.)[2]

Rite-Kem emailed its purchase orders from its office in Mississippi to Wegbreit in Arizona. (Doc. 12-1 ¶ 18; Doc. 17-1 ¶ 17 ["All of [Rite-Kem's] Purchase Orders were directed from Mississippi to [Wegbreit] in Arizona . . . ."].) These purchase orders listed Wegbreit's Arizona address. (Doc. 1-2 at 6-15.) After Rite-Kem would receive a

---

[2] In the Credit Application, under the text, "THE UNDERSIGNED AGREES TO UNCONDITIONALLY GUARANTEE PAYMENT OF ALL SUM OWED PURSUANT TO THIS AGREEMENT AND FURTHER AGREES TO ITS TERMS AS STATED ABOVE. THANK YOU," Lovil signed the line labeled "PERSONAL GUARANTOR." (Doc. 1-2 at 2.) Next to his signature, the text "Mark Lovil, President" is printed, and under his signature is a line labeled "TITLE," next to which is printed "President." (*Id.*)

shipment, Wegbreit would email an invoice to Rite-Kem seeking payment for the products included in the shipment. (Doc. 12-1 ¶ 19.) Rite-Kem would mail the resulting payment to Wegbreit's Arizona address. (*Id.* ¶ 20.)

The products from the purchase orders at issue were shipped from Tennessee, Mississippi, and New York to Rite-Kem in Mississippi. (*Id.* ¶¶ 23-26.)

Neither Lovil nor any other Rite-Kem representative traveled to Arizona for the purpose of transacting business with Wegbreit. (*Id.* ¶ 28.)

**ANALYSIS**

I. <u>Motion to Dismiss</u>

A defendant may move to dismiss for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). "In opposing a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015) (citation omitted). "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Id.* (citations and internal quotation marks omitted). "[U]ncontroverted allegations must be taken as true, and '[c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor,'" but "[a] plaintiff may not simply rest on the 'bare allegations of [the] complaint.'" *Id.* (citations omitted).

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1141 (9th Cir. 2017) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)). "Arizona law permits the exercise of personal jurisdiction to the extent permitted under the United States Constitution." *Id.* (citing Ariz. R. Civ. P. 4.2(a)). Accordingly, whether this Court has "personal jurisdiction over Defendants is subject to the terms of the Due Process Clause of the Fourteenth Amendment." *Id.*

"Constitutional due process requires that defendants 'have certain minimum

contacts' with a forum state 'such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Minimum contacts exist "if the defendant has 'continuous and systematic general business contacts' with a forum state (general jurisdiction), or if the defendant has sufficient contacts arising from or related to specific transactions or activities in the forum state (specific jurisdiction)." *Id.* at 1142 (citation omitted).

Wegbreit does not contend Defendants are subject to general jurisdiction in Arizona.[3] Thus, the Court must apply the Ninth Circuit's three-prong test to determine whether Defendants had sufficient contacts with Arizona to be subject to specific personal jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.,* it must be reasonable.

*Morrill*, 873 F.3d at 1142. "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.* (citation omitted). "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (citations omitted).

In the Ninth Circuit, courts use the "purposeful availment" test for claims arising from contract and the "purposeful direction" test for claims arising from tort. *Id.* Here, Wegbreit's claims arise from contract, so the "purposeful availment" test applies.

"To have purposefully availed itself of the privilege of doing business in the forum, a defendant must have performed some type of affirmative conduct which allows or

---

[3] Although Defendants apparently interpreted the complaint as asserting a general jurisdiction claim (Doc. 13 at 6-7; Doc. 15 at 3-4), Wegbreit did not advance any general jurisdiction-based arguments in its response to either motion to dismiss.

promotes the transaction of business within the forum state." *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008) (citation and internal quotation marks omitted). Courts must "look[] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). The defendant must itself engage in actions "that create a 'substantial connection' with the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citation omitted). Its contacts with the state must, thus, be more than "random, fortuitous, or attenuated." *Id.* (citation and internal quotation marks omitted).

When conducting this purposeful-availment analysis, courts must follow "the Supreme Court's admonition that the formation of a contract with a nonresident defendant is not, standing alone, sufficient to create jurisdiction." *Boschetto*, 539 F.3d at 1017 (citing *Burger King*, 471 U.S. at 478). Thus, where there is a contract with a resident party, in "determining whether the defendant purposefully established minimum contacts within the forum," courts should evaluate the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Burger King*, 471 U.S. at 479.

In *Burger King*, the Supreme Court applied these factors and determined that the district court in Florida had jurisdiction over the defendant. *Id.* at 478-82. The defendant had entered into a franchise agreement with Burger King, a Florida corporation, which was to last 20 years. *Id.* at 465-68. The governing contracts provided that the franchise relationship was governed by Florida law and called for payment of all fees to Florida. *Id.* at 465-66. Burger King's Florida headquarters would set franchise policy and resolve major problems, and other offices would conduct day-to-day monitoring. *Id.* at 466. The Court found that the defendant's contacts with Florida were substantial, given the defendant's "voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters." *Id.* at 480. In reaching this conclusion, the Court emphasized the parties' "20-year interdependent relationship," "that Burger King's operations are conducted and supervised from the Miami headquarters, that all relevant

notices and payments must be sent there, . . . that the agreements were made in and enforced from Miami," and the "provisions in the various franchise documents providing that all disputes would be governed by Florida law." *Id.* at 479-82.

### A. **Rite-Kem**

Rite-Kem's contacts with Arizona differ substantially from those in *Burger King* and are insufficient to conclude that Rite-Kem purposefully availed itself of privilege of doing business in Arizona. First, the parties did not have a long-term contract; instead, they had individual purchase orders for each transaction. "[A]s cases in this Circuit have held, a contract for the sale of a good that is a 'one-shot affair' and does not create a substantial connection or ongoing obligations in the forum state is not sufficient to establish purposeful availment." *Nimbus Data Sys., Inc. v. Modus LLC*, 2014 WL 7387200, *5 (N.D. Cal. 2014); *see also Boschetto*, 539 F.3d at 1019 (finding no purposeful availment where dispute involved "a one-time contract for the sale of a good that involved the forum state only because that is where the purchaser happened to reside, but otherwise created no 'substantial connection' or ongoing obligations there").

Although this case may not literally be a "one-shot affair," because the complaint arises from the alleged breach of multiple purchase orders, it is significant that those purchase orders did not create a long-term relationship between the parties imposing continuing obligations.[4] In *LLC Wholesale Supply, L.L.C. v. Allion HealthCare, Inc.*, 2013 WL 12284460 (D. Ariz. 2013), the court encountered an analogous situation. There, the defendants had received over 250 invoices from the plaintiffs for products purchased in an almost three-year period. *Id.* at *1. In dispute were payments on 20 invoices. *Id.* at *2. Despite the long-term relationship, the court found no purposeful availment because "the parties [did not] contemplate[] a continuing relationship with ongoing obligations," given that "[t]he parties did not have a long-term formal contract, but each purchase order and

---

[4] In support of its contention that the parties had "a continuing business relationship and continuous course of dealing," Wegbreit cites both the purchase orders and "a contractual undertaking in the form of a Credit Application binding [Rite-Kem] to make payments to [Wegbreit] in Arizona." (Doc. 18 at 9.) But the Credit Application only established the payment obligations under the individual purchase orders—it did not create additional obligations beyond those purchase orders.

- 7 -

delivery constituted a separate contract." *Id.* at *4.

Similarly, in *CTG Int'l (N. Am.), Inc. v. Fiberglass Indus., Inc.*, 2015 WL 1565428 (C.D. Cal. 2015), the dispute concerned the defendants' failure to make payments on 17 separate orders of fiberglass. Even though the defendants had initiated the business relationship with knowledge that the plaintiff's office was in California, had submitted purchase orders to the plaintiff's California office, had directed payment to the plaintiff's California office, and had contacted the plaintiff at the plaintiff's California office, the court still found no purposeful availment because the "individual transactions" resulted in "only 'minimal future consequences.'" *Id.* at *5.[5]

Second, although Wegbreit's two employees were located in Arizona, there is no evidence that, other than responding to emails and phone calls and receiving payments from Rite-Kem, these employees were doing anything in Arizona related to the purchase orders with Rite-Kem. This case is thus unlike *Burger King*, where Burger King was conducting and supervising franchise operations out of its headquarters in Florida. Here, the products in the purchase orders in dispute were not being shipped from Arizona and no Rite-Kem employees ever traveled to Arizona in connection with the relationship with Wegbreit. *Compare Azzarello v. Navagility, LLC*, 2008 WL 4614667, *4 (N.D. Cal. 2008) (no purposeful availment where plaintiff's "California location [did not] have any bearing on the terms or execution of the agreement"), *and CTG*, 2015 WL 1565428 at *4 (no purposeful availment where Defendant's "contact with Plaintiff in California was incidental: the fiberglass Defendant purchased from Plaintiff was manufactured in China and then shipped to Defendant in New York [and] no [Defendant] official ever entered California for any purpose related to the purchase"), *with Roth v. Garcia Marquez*, 942 F.2d 617, 622 (9th Cir. 1991) (contacts with California were sufficient in part because "the

---

[5] *See also Amergent Techs, LLC v. TransAtlantic Lines, LLC*, 2017 WL 3337166, *5-6 (S.D. Cal. 2017) (granting motion to dismiss based on lack of personal jurisdiction, where the plaintiff's "core argument seems to be that the [defendant] solicited and received services from a California company and should [therefore] now be held accountable in California courts," because (1) "this was a one-off contract for a short-term, discrete project to service ships outside of California," (2) "the parties engaged in minimal negotiations before entering into the Agreement," and (3) the contract did not contain a choice-of-law provision requiring that California law govern).

contract concerned a film, most of the work for which would have been performed in California," so "[t]his is not an instance where the contract was a one-shot deal that was merely negotiated and signed by one party in the forum; on the contrary, most of the future of the contract would have centered on the forum").

Third, unlike in *Burger King*, there were no provisions in any contract between the parties specifying that Arizona law would apply to any disputes between the parties.

To be sure, Rite-Kem knew Wegbreit was based in Arizona, engaged in telephone and email communications with Wegbreit, and mailed payments to Wegbreit in Arizona. Those actions are not, however, sufficient for Rite-Kem to have purposefully availed itself of the privilege of doing business in Arizona. *Azzarello*, 2008 WL 4614667 at *3 ("[K]nowledge that a party to a transaction resides in the forum state fails to establish the necessary minimum contacts."); *CTG*, 2015 WL 1565428 at *4 ("[T]he mere fact that Defendants opted to participate in a business agreement with Plaintiff knowing that Plaintiff had an office in California is insufficient to create minimum contacts."). Indeed, the Ninth Circuit has held that "ordinarily use of the mails, telephone, or other international communications simply do not qualify as purposeful activity invoking the benefits and protection of the [forum] state." *Peterson v. Kennedy*, 771 F.2d 1244, 1262 (9th Cir. 1985) (citation and internal quotation marks omitted). The Ninth Circuit has further recognized that the "normal incidents" of a business relationship, such as accepting payment, making phone calls, and sending letters, "by themselves, do not establish purposeful availment; this is not the deliberate creation of a substantial connection." *Sher v. Johnson*, 911 F.2d 1357, 1262 (9th Cir. 1990).[6]

Notwithstanding all of this, Wegbreit contends that "[i]f, as here, the defendant

---

[6] *See also Hupe v. Mani*, 2016 WL 3690093, *3 (D. Nev. 2016) (noting that "[t]he agreement and practice of mailing or making payment in the forum state does not weigh heavily 'in the calculus of contacts'" and finding that "the fact that Plaintiff Hupe is a Nevada resident and that regular payments for the slice of NWA 5000 were sent to him in Nevada is insufficient to invoke the benefits and protections of Nevada for the purposes of personal jurisdiction") (citation omitted); *Nimbus*, 2014 WL 7387200 at *5 ("[T]he fact that a defendant has solicited a contract and communicated with the plaintiff in the forum state by email and telephone is also insufficient to establish purposeful availment.").

initiated or solicited the economic relationship with the plaintiff created by contract, the jurisdictional inquiry usually comes to an end and personal jurisdiction is asserted by virtue of the Initiation/Solicitation Element alone." (Doc. 18 at 8.)

This argument fails for several reasons. First, the Supreme Court in *Burger King* instructed courts not to apply "mechanical tests" in deciding whether a contractual relationship is sufficient to establish purposeful availment and instead supplied various factors for courts to consider in making this determination. 471 U.S. at 478-79; *Azzarello*, 2008 WL 4614667 at *3 ("[A]lthough the solicitation of a contract is relevant to the jurisdictional analysis, *Burger King* requires more than such 'reaching out.'"). Thus, any contrary cases decided before *Burger King* are no longer good law.[7]

Second, the Ninth Circuit cases cited by Wegbreit are inapposite. In *Cubbage v. Merchent*, 744 F.2d 665 (9th Cir. 1984), the court relied on the defendants' extensive advertising in California to determine that the defendants had purposefully availed themselves of the privilege of conducting business in California. *Id.* at 668-70. In contrast, Rite-Kem did not advertise in Arizona and only reached out to Wegbreit upon receiving Susan's contact information. And in *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325 (9th Cir. 1984), the defendant had solicited an agreement from an Arizona entity "contain[ing] a choice of law provision specifying Arizona" and "made several visits to" and "accepted delivery of airplanes" in Arizona. *Id.* at 1332-33. Here, the parties do not have an agreement with a choice-of-law provision specifying that Arizona law applies and Rite-Kem has not engaged in any activity in Arizona.

Third, the remaining cases cited by Wegbreit are non-binding and inapposite. In *Interfirst Bank Clifton v. Fernandez*, 844 F.2d 279 (5th Cir. 1988), the defendant "called to Texas to purchase the plane," "voluntarily agreed to finance the plane through a Texas bank," "signed a loan agreement containing a Texas choice-of-law clause," "agreed to

---

[7] For example, Wegbreit places heavy reliance on *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220 (1957). (Doc. 17 at 3; Doc. 18 at 8-9.) Yet in *Burger King*, the Supreme Court clarified that although *McGee*'s holding that "even a single act can support jurisdiction" remains good law, such single acts "may not be sufficient to establish jurisdiction if their nature and quality and the circumstances of their commission create only an attenuated affiliation with the forum." 471 U.S. at 475 n.18.

- 10 -

return the plane to Texas for sale," and "signed a letter consenting to sale under Texas foreclosure procedures and agreeing to liability for any deficiency between the sale price and the amount of the note." *Id.* at 283-84. And in *First City Bank, N.A. v. Air Capitol Aircraft Sales, Inc.*, 820 F.2d 1127 (10th Cir. 1987), the defendant's representative had not only "initiated the contact with the [plaintiff]" in Oklahoma but also traveled to Oklahoma to meet with the plaintiff's representative at its office to discuss the terms at issue. *Id.* at 1131. The court also considered the defendant's "prior business arrangements with the [plaintiff]" in finding that the parties "had a continuing and substantial business relationship." *Id.* The contacts in both of those cases are far more significant than those here.

Because the Court finds that Wegbreit has failed to satisfy the first prong of the Ninth Circuit's three-part test for specific personal jurisdiction—purposeful availment—the Court need not address the other two factors.

B. **Lovil**

Wegbreit argues that "[i]t is well recognized that, whereas [sic] here a nonresident in the position of the Individual Defendant has executed and delivered a personal guaranty or guaranty of performance to a plaintiff in another forum state, this constitutes personal availment within that forum state and subjects the nonresident to personal jurisdiction in the forum state both under controlling state law and federal law precedents." (Doc. 20 at 8-11.)[8] In support of this argument, Wegbreit cites *Forsythe v. Overmyer*, 576 F.2d 779 (9th Cir. 1978), and *Hamada v. Valley National Bank*, 555 P.2d 1121 (Ariz. Ct. App. 1976).

This argument misses the mark. *Forsythe* and *Hamada* were decided before *Burger King*, in which the Supreme Court recognized that the act of contracting with an out-of-state party does not automatically establish sufficient minimum contacts in that state. 471

---

[8] To be clear, the parties dispute whether Lovil signed the Credit Application's guarantee provision in his individual or official capacity. Nevertheless, "[c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Ranza*, 793 F.3d at 1068 (citation and internal quotation marks omitted). Thus, for purposes of ruling on Lovil's motion to dismiss, the Court thus accept Wegbreit's contention that Lovil signed the guarantee provision in his individual capacity.

- 11 -

U.S. at 478. Here, neither the purchase orders nor the Credit Application were connected to Arizona in any way other than the fortuitous fact that Wegbreit happens to be an Arizona entity. *Hamada* also provided no reasoning in support of its conclusion that "the execution of the letter which Mr. Hamada knew was going to be used in a transaction in Arizona provided sufficient minimal contact with this state for it to exercise jurisdiction." 555 P.2d at 1124. It is, thus, unpersuasive to this Court.[9]

This case is also factually different from *Forsythe*, in which the defendant was "assuming personal liability in the event of default on a contract expressly subject to jurisdiction in the California forum" and the "guaranty was part of the negotiating strategy in California." 576 F.2d at 783. Here, the purchase orders are not "expressly subject to" Arizona law, Lovil "electronically signed" the Credit Application while in Mississippi, and there was no "negotiating strategy" in Arizona. *Cf. Rosen Materials of Nevada, LLC v. MDA LLC*, 2018 WL 3232832, *3 (D. Nev. 2018) (distinguishing *Forsythe* and finding that individual defendant who had executed personal guarantee had not "purposefully availed himself of the privilege of conducting activities in Nevada" where "there [was] no evidence . . . the personal guarantee . . . was negotiated in Nevada," "it appear[ed] to be a form contract, and [defendant] declare[d] that he executed it in his office in Utah," and "there [was] no evidence that [defendant] regularly involved himself personally in his company's ventures by personally guaranteeing their obligations like the owner in *Forsythe* did").

Finally, to the extent Wegbreit is contending that Lovil's actions in his capacity as president of Rite-Kem are sufficient to establish purposeful availment, this argument is also unavailing. As a threshold matter, "a corporate officer who has contact with a forum

---

[9] Wegbreit is mistaken in contending that *Hamada* is "controlling." (Doc. 20 at 8, 9, 13, 14.) Federal courts do indeed "follow state law in determining the bounds of their jurisdiction over persons." *Morrill*, 873 F.3d at 1141 (citation omitted). But in doing so, this Court simply looks to Arizona's long-arm statute to determine that "Arizona law permits the exercise of personal jurisdiction to the extent permitted under the United States Constitution." *Id.* (citing Ariz. R. Civ. P. 4.2(a)). Only where a federal court is interpreting state law is it "bound by the decisions of the highest state court." *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1391 (9th Cir. 1994). The Court is not interpreting state law here, and, in any event, the Arizona Court of Appeals is not Arizona's highest court.

only with regard to the performance of his official duties is not subject to personal jurisdiction in that forum." *Forsythe*, 576 F.2d at 783-84. Moreover, the Court has found that Rite-Kem's contacts are insufficient to establish purposeful availment.

Again, because the Court finds that Wegbreit has failed to satisfy the first prong of the Ninth Circuit's three-part test for specific personal jurisdiction—purposeful availment—as to Lovil, the Court need not address the other two factors.

II. <u>Motion to Transfer Venue</u>

Because the Court grants both motions to dismiss, the Court will deny as moot the alternative requests to transfer venue.

Accordingly, **IT IS ORDERED** that:

(1) Rite-Kem's motion to dismiss for lack of personal jurisdiction (Doc. 12) is **granted**;

(2) Lovil's motion to dismiss for lack of personal jurisdiction (Doc. 14) is **granted**;

(3) Rite-Kem's and Lovil's alternative requests to transfer venue are **denied**; and

(4) Wegbreit's complaint is **dismissed without prejudice**. The Clerk of Court is directed to enter judgment accordingly and shall terminate this case.

Dated this 31st day of July, 2019.

Dominic W. Lanza
United States District Judge